UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:22-CV-00218-GNS-LLK

CHRISTOPHER SCOTT STERUSKY, as Administrator
of the Estate of Chris Sterusky                                                    PLAINTIFF

v.

DETRICK COOPER                                                                      DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 48), Defendants Motions to Exclude (DN 50, 51), and Plaintiff's Motions to Exclude (DN 45, 46). The motions are ripe for adjudication.

## I.      BACKGROUND

Defendant Detrick Cooper ("Cooper"), an officer with the Elizabethtown Police Department, responded to a call to conduct a wellness check at an apartment complex in Elizabethtown. (Cooper Dep. 21:15-18, Nov. 22, 2022, DN 48-2).  Afterwards, Cooper noticed a vehicle parked in the apartment parking lot that lacked a valid government-issued license plate. (Cooper Dep. 25:20-26:5).  Cooper approached the vehicle and asked the occupant, Decedent Chris Sterusky ("Sterusky"), for a photo ID; Sterusky, acting anxiously, provided a paper document and assured Cooper repeatedly that he did not have any weapons or want to create any issues, and asked for permission to leave.  (Cooper Video 09:20:00-09:22:30, Dec. 11, 2021, DN 47-1).  Sterusky informed Cooper that he did not have a social security card and identified himself as Samson El Khabid Mudamir.  (Cooper Video 09:22:30-09:22:45).  Cooper explained to Sterusky that he needed a valid driver's license and license plate to legally operate his vehicle,

Sterusky responded, "I am not a member of the corporation, sir." (Cooper Video 09:23:30-09:23:45).

Sterusky grew increasingly anxious and asked that he be allowed to walk away from the encounter. (Cooper Video 09:24:30-09:25:05). Cooper asked Sterusky for more information about himself, including his birth name, and Sterusky would not provide it. (Cooper Video 09:26:00-09:26:55). Cooper then used his walkie talkie to request back up, prompting an exasperated and fretful reaction from Sterusky. (Cooper Video 09:26:55-09:27:00). Sterusky began pleading with Cooper, repeating that he did not intend to cause any trouble, and attempted to sit back in his vehicle. (Cooper Video 09:27:01-09:27:40). Sterusky then asked permission to sit in his vehicle, which Cooper denied, prompting Sterusky to accuse Cooper of "playing with" him. (Cooper Video 09:27:31-09:27:44). Sterusky then asked permission to turn off his vehicle, which Cooper denied, then Sterusky opened the car door without permission. (Cooper Video 09:27:55-09:28:00). Cooper attempted to restrain Sterusky, and Cooper's body camera fell off of his chest. (Cooper Video 09:27:56-09:28:04). In the body camera's audio, Sterusky can be heard pleading for permission to sit down, stating that it had been a long morning, and asking why Cooper was doing this to him. (Cooper Video 09:28:04-09:28:21). Sterusky then twice said, "Fuck it," and someone yelled a few seconds later.[1] (Cooper Video 09:28:20-09:28:25). Cooper then fired seventeen shots.[2] (Cooper Video 09:28:25-09:28:32).

Elizabethtown Police Officer Ryan Slaubaugh ("Slaubaugh") arrived soon after shots were fired, and while running towards the scene, heard Cooper state over the radio, "He pulled a knife on me and tried to stab me in my chest." (Slaubaugh Video 09:28:50-09:28:57, Dec. 11,

---

[1] The parties appear to agree that it was most likely Cooper who yelled. (*See* Def.'s Mem. Supp. Mot. Summ. J. 10, DN 48-1; Pl.'s Resp. Def.'s Mot. Summ. J. 11, DN 59).

[2] As discussed below, the parties each offer different theories of what occurred after Cooper's body camera fell off his chest.

2021, DN 47-3).   Cooper stood outside of Sterusky's vehicle, which was moving, apparently believing that Sterusky was operating the vehicle.   (Slaubaugh Video 09:29:00-09:29:05). Cooper informed Slaubaugh that Sterusky had a knife.   (Slaubaugh Video 09:29:06-09:29:12). The car rolled backwards until it collided with another vehicle in the parking lot.   (Slaubaugh Video 09:29:15-09:29:22).   Slaubaugh broke the passenger window of Sterusky's vehicle and found Sterusky's body.   (Slaubaugh Video 09:29:23-09:30:40).   Emergency medical services arrived a short time later and determined that Sterusky was dead.   (Slaubaugh Video 09:35:00-09:36:00).

Plaintiff Christopher Sterusky ("Plaintiff"), Sterusky's father, initiated this action in Hardin Circuit Court (Kentucky), and Cooper removed to this Court.   (*See* Notice Removal, DN 1).  Plaintiff brings a claim for violation of his Fourth Amendment rights under 42 U.S.C. § 1983 (Count I), assault and battery under Kentucky law (Count II), and wrongful death (Count III).  (Am. Compl. ¶¶ 33-52, DN 28).

## II.   <u>JURISDICTION</u>

Cooper removed this action to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331 based on two paragraphs in the original Complaint that referenced Sterusky's constitutional rights.  (Notice Removal 1).  In Paragraph 18, the Complaint alleges that "[a]t all times relevant herein, Chris had a clearly established right under the Fourth Amendment to be free from the use of excessive force by the Defendant." (Compl. ¶ 18).  Then, in Paragraph 36 alleges that "[t]he Defendant's actions were in violation of Chris Sterusky's clearly established constitutional rights."  (Compl. ¶ 36).  Shortly after the removal, Plaintiff moved to remand the matter for want of subject matter jurisdiction.  (Pl.'s Mem. Supp. Mot. Remand 1-3, DN 8-1).  The motion to remand was held in abeyance in advance of telephonic

status conferences, after which Plaintiff moved to amend the Complaint to specifically assert a claim under 42 U.S.C. § 1983.  (Order, DN 11; Pl.'s Mot. Amend, DN 14; Am. Compl. 1).  The motion to amend was granted, but the motion to remand was never resolved.  (Order, DN 27).

Reviewing the original Complaint, the Court is satisfied that the aforementioned paragraphs raised a federal question and that this action was properly removed pursuant to 28 U.S.C. § 1441.  To the extent that the original Complaint failed to raise a federal question, however, Plaintiff cured any jurisdictional defect by voluntarily amending his complaint to include a federal cause of action.  (*See* Am. Compl. ¶¶ 33-39).  While typically subject matter jurisdiction is determined by looking at a complaint as it existed at the time of removal, this rule is intended to apply to the exact opposite situation as that present here: where a plaintiff in a removed action attempts to thwart subject matter jurisdiction by removing federal claims or adding a non-diverse defendant.  *See, e.g.*, *Fleming v. Tinnell*, No. 3:19-CV-00125-RGJ, 2021 WL 3356327, at *2-3 (W.D. Ky. Aug. 2, 2021) (declining to remand to state court a removed action where the plaintiff amended his complaint to withdraw federal claims); *16 Front St., L.L.C. v. Miss. Silicon, L.L.C.*, 886 F.3d 549, 558 (5th Cir. 2018) ("The time-of-filing rule is most frequently employed in the removal context, to prevent a plaintiff from re-pleading after removal to deprive the federal court of jurisdiction.").

There is authority indicating that situations like this one do not implicate the time-of-filing rule, and that a plaintiff's voluntary action can cure jurisdictional defects.  *Tolton v. Am. Biodyne, Inc.*, 48 F.3d 937, 941 n.2 (6th Cir. 1995) ("Amending a complaint after removal cures a jurisdictional defect." (citing *Brough v. United Steel Workers of Am., AFL-CIO*, 437 F.2d 748, 750 (1st Cir. 1971)); *see, e.g.*, *Brough*, 437 F.2d at 750 ("This amendment had the effect of curing the defect in the district court's jurisdiction.  Indeed, had such an amendment been made

while the parties were in the state court, the case would have been immediately removable. Clearly plaintiff cannot be permitted to invoke the jurisdiction of the federal court, and then disclaim it when he loses."   (internal citation omitted)); *In re AT&T Fiber Optic Cable Installation Litig.*, Nos. IP 99-9313-C H/K, 2001 WL 1397295, at *4 (S.D. Ind. Nov. 5, 2001) ("[O]nce he decided to take advantage of his involuntary presence in federal court to add a federal claim to his complaint he was bound to remain there.  Otherwise he would be in a position where if he won his case on the merits in federal court he could claim to have raised the federal question in his amended complaint voluntarily, and if he lost he could claim to have raised it involuntarily and to be entitled to start over in state court."); *cf. ConnectU LLC v. Zuckerburg*, 522 F.3d 82, 96 (1st Cir. 2008) (maintaining jurisdiction over an action where the original complaint contained no basis for subject matter jurisdiction, but the amended complaint, filed as of right, did); *Miss. Silicon*, 886 F.3d at 554-62 (finding no issues in maintaining subject matter jurisdiction over a federal claim against a Defendant added in an amended complaint despite affirming that there was no basis for subject matter jurisdiction over the original complaint at the time of filing).

Accordingly, Plaintiff's Motion to Remand is denied as moot.  This Court properly has federal question jurisdiction over this case because both the original Complaint and Amended Complaint raised federal issues.

## IV.   DISCUSSION

### A.   Motions to Exclude (DN 45, 46, 50, 51)

#### 1.   *Standard of Review*

Fed. R. Evid. 702 governs expert witness testimony and provides that an expert's opinion is admissible if:

(a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product of reliable principles and methods; and

(d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court must act as a gatekeeper to ensure that expert testimony is both relevant and reliable, as required by Fed. R. Evid. 104 and 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Conwood Co. v. U.S. Tobacco Co., L.P.*, 290 F.3d 768, 792 (6th. Cir. 2002) (citation omitted). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof," and "[a]ny doubts regarding the admissibility . . . should be resolved in favor of admissibility." *In re E. I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728 (S.D. Ohio 2015) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendments). "[R]ejection of expert testimony is the exception, rather than the rule," as "[t]he Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted); *Certain Underwriters at Lloyd's v. Morrow*, No. 1:16-CV-00180-GNS-HBB, 2019 WL 3558177, at *8 (W.D. Ky. Aug. 5, 2019) (citing *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citation omitted), *abrogated on*

*other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998), *as recognized in Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014).  "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert*, 509 U.S. at 592 (internal citation omitted) (citations omitted).   "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."  *Id.* (internal quotation marks omitted) (internal citation omitted).  Still, the "liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'"  *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

When determining the reliability of an expert's testimony, a key is "whether the reasoning or methodology underlying the testimony is scientifically valid . . . ."  *Daubert*, 509 U.S. at 592-93.  The Supreme Court has advised, however, that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 594-95.  Though there is no definitive checklist for determining whether an expert's testimony is reliable, *Daubert* outlines a non-exhaustive list of factors for courts to consider:  (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ."  *Id.* at 593-94 (citation omitted).

Where a party challenges the testimony of a proffered expert for insufficient factual basis, data, principles, methods, or their application, "the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'"

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to admit relevant evidence liberally against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citation omitted). Ultimately, "the trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152; *Conwood Co., LP*, 290 F.3d at 792; *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

"The subject of an expert's testimony must be 'scientific . . . knowledge.'" *Daubert*, 509 U.S. at 589-90. The gatekeeping obligations in *Daubert* only applied to "scientific knowledge" but were later extended to include "testimony based on 'technical' and 'other specialized' knowledge . . . ." *Id.* at 592; *Kumho Tire Co.*, 526 U.S. at 141, 152 (citation omitted). "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Id.*; *see Wellman v. Norfolk & W. Ry. Co.*, 98 F. Supp. 2d 919, 923 (S.D. Ohio 2000) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." (citation omitted)); *cf. Nemir v. Mitsubishi Motor Sales of Am., Inc.*, 6 F. App'x 266, 275 (6th Cir. 2001) ("In evaluating an expert witness, '*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at

hand . . . not that they know the answers to all the questions a case presents . . . .'" (citation omitted)).  As the Supreme Court has noted:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

The Sixth Circuit has noted "[r]ed flags that caution against certifying an expert[,]" such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citation omitted); *cf. Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("We have held that a district court is required to rule out 'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method.'" (citation omitted)); *Scientific Method*, Black's Law Dictionary (11th ed. 2019) ("The process of generating hypotheses and testing them through experimentation, publication, and replication."). Ultimately, it is the movant's burden to establish that its proffered experts' theories are "reliable and adequately supported by sound technical data, methodology and testing."  *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) (citation omitted).

### 2.  *Plaintiff's Motion to Exclude Animations of Tom Martin (DN 45)*

Plaintiff asks that the Court exclude eight "forensic illustrations" that Cooper's expert witness Tom Martin ("Martin") prepared for trial, arguing that Martin is unqualified to create images of this sort and that the images are unreliable.  (Pl.'s Mot. Exclude Martin 1, DN 45).

With respect to Martin's qualifications, Plaintiff does not dispute that Martin is "an experienced crime scene investigator" but argues that nothing in his "lengthy list of qualifications" demonstrates a background in producing non-photographic visual depictions.

9

(Pl.'s Mot. Exclude Martin 2).  Cooper responds that Martin is qualified to create images of this sort and submits Martin's affidavit, which details his relevant experience.  (*See* Martin Aff. ¶¶ 1-5, DN 55-2).

In his affidavit, Martin explained that in his work as a New York state trooper he frequently created "sketches, drawings, or illustrations" when recreating a crime or shooting. (Martin Aff. ¶ 3).  He also stated that he has completed multiple classes since 1999 related to using photoshop to create demonstrative evidence.  (Martin Aff. ¶ 4).  Finally, he explained that throughout his career he has created numerous images like those at issue here.  (Martin Aff. ¶ 5). Plainly, Martin's uncontested experience as a law enforcement officer alongside his experience creating demonstrative aids like those at issue here render him qualified to create these images.

Plaintiff argues that even if Martin is qualified to create these images, the images are unreliable.  (Pl.'s Mot. Exclude Martin 7-8).  Plaintiff points to the quality of the images and that the images only depict Cooper's representation of what occurred.  (Pl.'s Mot. Exclude Martin 7-8).  With respect to the quality, Plaintiff notes discrepancies between the models used in the images and the individuals depicted.  (Pl.'s Mot. Exclude Martin 8).  Specifically, the models in the images are blue, wearing track suits, and appear shorter than Cooper and Sterusky should be compared to the vehicle.  (Pl.'s Mot. Exclude Martin 8).  Plaintiff is free to explore them on cross-examination; however, these differences are irrelevant to the purpose of the illustrations: to visualize Martin's opinion about Cooper's and Sterusky's positions in the seconds after Cooper's body camera was knocked off.  (*See* Martin Report 16-21, DN 45-2).

With respect to the evidentiary bases for the depictions, Martin explains in his affidavit that he formed his opinion about what occurred based on Cooper's testimony, police reports, photographs, the Kentucky State Police ("KSP") investigator, Plaintiff's experts, and by visiting

the scene directly and inspecting the evidence.  (Martin Aff. ¶¶ 6-7).  Plaintiff is certainly free to cross-examine Martin about the basis of his depictions, but the Court is satisfied that these images reflect Martin's theory of what transpired between Sterusky and Cooper and that the images may assist the jury in understanding his opinion.[3]  *See Belisle v. BNSF Ry. Co.*, No. 08-2087-EFM, 2010 WL 1424344, at *6 (D. Kan. Apr. 5, 2010) ("Because we otherwise find these animations to be illustrative of the expert's theory of the case, and will assist the jury in understanding that theory, we are not inclined to exclude them at this juncture.").

Accordingly, this motion is denied.

**3.**       ***Plaintiff's Motion to Exclude Certain Opinions of John Ryan (DN 46)***

Plaintiff argues that certain opinions of Cooper's expert John Ryan ("Ryan") must be excluded because they exceed the scope of permissible expert testimony.  (*See* Pl.'s Mot. Exclude Ryan 1-10, DN 46).

Plaintiff does not dispute that Ryan can "testify on generally accepted standards for police practices and procedures regarding excessive force claims."  (Pl.'s Mot. Exclude Ryan 1). Plaintiff contends, however, that some of Ryan's opinions go beyond the bounds of appropriate expert testimony because he offers impermissible legal conclusions, statements of law, and factual interpretation and application.  (Pl.'s Mot. Exclude Ryan 1, 2, 5).  Plaintiff specifies several opinions that he asserts must be excluded.  (*See* Pl.'s Mot. Exclude Ryan 4-10).

---

[3] Martin is, of course, not permitted to testify or imply that the images or the computer programs used to create them are anything other than a depiction of how he opines the shooting unfolded. For example, he cannot testify that the computer programs he used computed or extrapolated any additional information from the evidence in this case.

### a.      Impermissible Legal Conclusions

Plaintiff identifies eleven opinions from Ryan's report that he argues must be excluded because they include legal conclusions that embrace the ultimate issue of whether Cooper used excessive force.  (Pl.'s Mot. Exclude Ryan 2-5).

Plaintiff relies heavily on *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994).  (*See* Pl.'s Mot. Exclude Ryan 2-3).  In *Berry*, the Sixth Circuit reversed a jury verdict against the defendant based on, *inter alia*, the nature of the plaintiff's expert testimony.  *Berry*, 25 F.3d at 1347.  The case revolved around whether the Detroit Police Department failed to properly discipline officers, resulting in the shooting of the decedent.  *See id.* at 1347-48.  The plaintiff's expert had a degree in sociology, and his experience in law enforcement was comprised of six years as deputy sheriff, four years as an elected sheriff, and four years with the Justice Department, after which he became a law enforcement consultant.  *Id.* at 1349.  The expert testified that the police department's "failure to direct and discipline and train their officers not to use improper deadly force constitute a pattern of gross negligence."  *Id.* at 1353.  The expert equated gross negligence with deliberate indifference, which he defined as "conscious knowledge of something and not doing anything about it."  *Id.*  The Sixth Circuit explained that this sort of testimony violated Fed. R. Evid. 704(a) because, "although an expert's opinion may 'embrace[] an ultimate issue to be decided by the trier of fact[,]' the issue embraced must be a factual one."  *Id.*  (alterations in original) (internal citation omitted) (quoting Fed. R. Evid. 704(a)).  While it may have been permissible to opine "that the discipline in the Detroit Police Department was lax" or regarding "what he believed to be the consequences of lax discipline[,]" it was improper for him to opine that "lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens."  *Id.*  Based on

12

this discussion, the Sixth Circuit found that the expert's qualifications and opinion did not support the jury verdict. *See id.* at 1348, 1356.

Plaintiff identifies Ryan's opinions which he believes run afoul of the principle discussed in *Berry*, but does not explain why. (*See* Pl.'s Mot. Exclude Ryan 3-5). As an initial matter, Ryan, unlike the expert in *Berry*, is eminently qualified to opine regarding police practices and training, and Plaintiff has lodged no objection to his qualifications. Indeed, the Sixth Circuit, in a later decision, explained, "the chief reason for our decision in *Berry* was that the expert's credentials demonstrated that he had no specific expertise about police activities." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004).

Next, and more importantly, most of Ryan's opinions are couched in terms of what was appropriate considering "generally accepted policies, practices, training and industry standards in law enforcement." (*See, e.g.*, Ryan Report ¶ 98, DN 46-1). Those statements reflect Ryan's opinion that if Cooper's testimony is credible, he did not violate nationally recognized police standards governing excessive force. *See Champion*, 380 F.3d at 908.

At least one of Ryan's opinions, however, must be excluded. In his report, Ryan stated that "[i]t is well known that [if] an officer reasonably perceives an immediate threat of serious bodily harm or death against themselves, another officer, or any third party, the officer may respond with deadly force." (Ryan Report ¶ 86). This statement is not couched in terms of police practices or training and, even if not intended as such, constitutes a statement of law. (Ryan Report ¶ 86). Allowing an expert to convey legal standards "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (alteration in original) (quoting *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)). Therefore, Ryan is precluded from offering testimony about when

on officer may use deadly force as a general matter, as opposed to in the context of generally accepted policies, practices, training, and industry standards.

With respect to the remaining opinions, aside from his general discussion of *Berry* and related case law, Plaintiff has failed to specifically explain how or why the identified opinions merit exclusion. (*See* Pl.'s Mot. Exclude Ryan 3-5). Reviewing each, the Court is satisfied that they are premised upon Ryan's expertise in police practices and do not express legal conclusions.

### b.     Impermissible Interpretation of Facts

Next, Plaintiff moves for exclusion of certain opinions where he contends that Ryan's report "is replete with opinions that accept the versions most favorable to Cooper and, in many situations, applies the law to those facts." (Pl.'s Mot. Exclude Ryan 6). Plaintiff also asserts that several of Ryan's opinions are "simple observations made of the same body cam footage preceding the shooting that the jury will watch." (Pl.'s Mot. Exclude Ryan 6). Plaintiff again identifies numerous opinions, but offers no specific explanation as to the bases for exclusion. (*See* Pl.'s Mot. Exclude Ryan 7-8).

Legal actions that go to trial contain contested issues of fact, and Plaintiff's assertion that Ryan has adopted Cooper's testimony is not grounds for exclusion. Plaintiff will have the opportunity to cross-examine Ryan on the bases for his opinions. Accordingly, this argument is not well-taken.

### c.     Remaining Objections

Plaintiff also objects to three other opinions in Ryan's report on different grounds. (*See* Pl.'s Mot. Exclude Ryan 8-10).

First, Plaintiff objects to two opinions related to the use of deadly force against a fleeing suspect. (Pl.'s Mot. Exclude Ryan 8-9). The first opinion relates to a section in a book on

deadly force that discusses the use of force against a fleeing suspect with a weapon.  (Ryan Report ¶ 85).  The second states that law enforcement training and texts indicate that a suspect fleeing with a firearm can turn and fire two shots at an officer before the officer can react.  (Ryan Report ¶ 86).  Plaintiff argues that the book mentioned in the first opinion is based on an outdated Department of Justice policy and that both opinions relate to a fleeing suspect with a pistol, rendering them inapplicable to this case since there is no allegation that Sterusky had a firearm.  (Pl.'s Mot. Exclude Ryan 8-9).  Reviewing Ryan's report, this was a part of his opinion relating to reaction time and the need for officers to make split-second decisions when pursuing a suspect.  (Ryan Report ¶ 85).  Ryan acknowledges that this is not a "firearms case," but opines that the "same reactionary gaps apply to any sudden confrontation between an officer and a suspect . . . ."  (Ryan Report ¶ 85).  A discussion of factors present in a confrontation between a police officer and a suspect falls squarely within Ryan's expertise and may be helpful to the jury in understanding how a reasonable officer should act in a situation similar to the present facts.  Plaintiff's criticisms go to weight as opposed to credibility and may be raised through cross-examination.

Finally, Plaintiff objects to Ryan's opinion that "the damage to Cooper's shirt and the recovery of the knife provides physical evidence consistent with an attack with an edged weapon by Sterusky."  (Pl.'s Mot. Exclude Ryan 10 (quoting Ryan Report ¶ 102)).  Plaintiff's objection to this opinion is based on Ryan's qualifications, as Ryan testified that he does not do "any forensic stuff."  (Ryan Dep. 36:17-22 Nov. 21, 2023, DN 46-6).  In preparing his opinion in this case, Ryan reviewed the KSP lab report, which states that the defect on Cooper's uniform is consistent with a cut.  (Def.'s Mot. Summ. J. Ex. 38, at 1, DN 49-8).  While Ryan may not offer

forensics opinions, he is permitted to explain the bases for his opinions in this case, such as why he believes Cooper was attacked with a knife.  Accordingly, this argument is not well-taken.

Based on the foregoing, Plaintiff's motion to exclude Ryan is granted in part.

### 4.     *Cooper's Motion to Exclude Joseph Rosenberg (DN 50)*

Cooper moves to exclude Plaintiff's expert economist Joseph Rosenberg ("Rosenberg"). (Def.'s Mot. Exclude Rosenberg 1, DN 50).  Cooper argues that Rosenberg's testimony is unreliable and fails to assist the jury.  (Def.'s Mot. Exclude Rosenberg 5-9).

In his report, Rosenberg offered two potential methods for calculating the amount of money Sterusky would have earned throughout the rest of his life if he had not died.  First, he used the "total offset" method, "which assumes that the rate of increase in earnings is equal to the interest rate."  (Rosenberg Report 5, DN 62-1 (citation omitted)).  Rosenberg took Sterusky's earnings for the year 2021 up until the date of his death, extrapolated those through the rest of the year, and adjusted for the difference in average earnings for all workers in 2021 and 2023. (Rosenberg Report 4-5).  Rosenberg increased the amount by 13.3% to reflect "benefits, limited to employer-paid insurance and retirement and savings" based on the Bureau of Labor Statistics. (Rosenberg Report 5).  He then multiplied the resulting figure by 33.5247, which he calculated to be Sterusky's "Work Life Expectancy" according to "the widely referenced" Skoog, Ciecka, and Kruger table.  (Rosenberg Report 5-6).  Based on this method, Rosenberg calculated that Sterusky's lost earning capacity should be valued at $1,274,826.  (Rosenberg Report 6).

Next, Rosenberg explained that since Sterusky had just completed a bachelor's degree, the "age-earning cycle" method could be a more reasonable alternative for calculating Sterusky's lost earning capacity because this method is often used when a deceased individual had not had the opportunity to fully realize the earning potential of a new career obtained as a result of a new

academic degree.  (Rosenberg Report 5).  This method, in simple terms, applies a number of factors to reflect the growth of Sterusky's expected future earnings based on the average wage growth of an individual with a bachelor's degree.  (Rosenberg Report 10-13).  Using this method, Rosenberg calculated that Sterusky's lost earning capacity would be $2,235,512.  (Rosenberg Report 6).

Cooper characterizes Rosenberg's opinion as speculative and lacking analysis and raises several specific criticisms.  (Def.'s Mot. Exclude Rosenberg 6-7).  First, he complains that Rosenberg only looked at one year of Sterusky's earnings, 2021, ignoring years like 2009 through 2013, when Sterusky was unemployed.  (Def.'s Mot. Exclude Rosenberg 6).  In his report, Rosenberg explained, "Given that 2020 was the initial year of the Covid-19 pandemic with a major increase in unemployment (documented further in this report), the year 2021 represents a minimum level of income that Mr. Sterusky should have been able to earn after attaining his BA degree."  (Rosenberg Report 4).  Cooper's stated belief that Rosenberg ought to have considered prior years of Sterusky's employment, particularly a period of time beginning over a decade before his death, in determining Sterusky's lost earning capacity does not render Rosenberg's opinion unreliable.  Accordingly, this argument is not well-taken.

Next, Cooper points out that Rosenberg did not review any of Sterusky's tax returns in forming his opinion.  (Def.'s Mot. Exclude Rosenberg 6).  Cooper asserts that there is no evidence of reported income and that none of his calculations are based on what Sterusky reported to the IRS.  (Def.'s Mot. Exclude Rosenberg 6).  Rosenberg explained in his deposition that Sterusky's tax returns would not be helpful in rendering his opinion because he received an itemized list of Sterusky's earnings produced by the Social Security administration.  (Rosenberg

Dep. 20:21-21:8, Sept. 21, 2023, DN 62-2).  Accordingly, the fact that Rosenberg did not review Sterusky's tax returns does not destroy the reliability of his opinion.

Third, Cooper contends that Rosenberg admitted that "he is simply predicting the future." (Def.'s Mot. Exclude Rosenberg 6-7).  Cooper points to Rosenberg's admission that his opinion is an "estimate[]" based on "purely hypothetical numbers."  (Def.'s Mot. Exclude Rosenberg 6-7).  That calculating the lost earning capacity of a deceased individual requires estimation and guesswork is not a basis for exclusion.  *See, e.g., In re Air Crash at Lexington, Aug. 27, 2006*, No. 5:06-CV-316-KSH, 2008 WL 2704159, at *2 (E.D. Ky. July 2, 2008) ("[B]y its very nature the calculation of an award for lost earnings must be a rough approximation." (quoting *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983))).  Accordingly, this argument is without merit.

Next, Cooper complains that Rosenberg's calculations do not account for consumption. (Def.'s Mot. Exclude Rosenberg 7).  "Kentucky law . . . does not deduct the decedent's projected living expenses and instead allows recovery of the decedent's projected gross earnings." *Eastman v. Pope*, No. 3:09-CV-0825, 2011 WL 1323021, at *1 (M.D. Tenn. Apr. 5, 2011) (citing *Charlton v. Jacobs*, 619 S.W.2d 498, 500 (Ky. App. 1981)); *see also Paducah Area Pub. Libr. v. Terry*, 655 S.W.2d 19, 23-24 (Ky. App. 1983) (citing *Charlton* in support of exclusion of evidence of taxes); *but see In re Air Crash at Lexington*, No. 5:06-CV-315-KSF, 2008 WL 2897072 (E.D. Ky. July 17, 2008) (declining to consider an argument that *Charlton* is contrary to an unnamed Kentucky Court of Appeals case from when the Court of Appeals was Kentucky's highest court).  Accordingly, this argument is not well-taken.

Cooper next asserts that Rosenberg did not rely on any articles or treatises in forming his opinion.  (Def.'s Mot. Exclude Rosenberg 7).  Rosenberg did testify to that effect.  (Rosenberg

Dep. 43:11-13).   A review of his report, however, reveals that he cites to numerous articles throughout.   (*See, e.g.*, Rosenberg Report 3 n.1, 7 n.2).   Even accepting that exclusion would be appropriate if Rosenberg did not rely on any articles or treatises, the report belies this assertion. Accordingly, this argument is rejected.

Cooper also contends that Rosenberg did not factor Sterusky's drug use or criminal conduct and asserts, without support, "It is certainly an unrealistic assumption to think that Sterusky would have worked continuously, or even significantly, given his limited, sporadic work history and his drug use."   (Def.'s Mot. Exclude Rosenberg 7).   Cooper's belief that Sterusky may have earned less in the future than he did in 2021 due to his alleged criminal conduct and drug use does not establish that Rosenberg's opinion lacks a "reliable foundation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30.   This is a subject which may be potentially explored on cross-examination.

Cooper highlights Rosenberg's testimony that he was unaware where Sterusky was working, how much he was paid an hour, and whether he had a permanent job.   (Def.'s Mot. Exclude Rosenberg 7; *see* Rosenberg Dep. 10:21-12:24).   Rosenberg explained that he relied on Sterusky's annual earnings in forming his opinion.   (Rosenberg Dep. 11:24-12:1).   Cooper can ask Rosenberg about factors that he believes could have lowered Sterusky's future earnings on cross-examination.   Cooper's criticisms fail to show that Rosenberg's opinion is unreliable and instead are topics that are best suited for exploration during cross-examination.

Cooper further argues that Rosenberg's opinions are not helpful to the jury because Rosenberg's opinion consists of simple mathematics.   (Def.'s Mot. Exclude Rosenberg 8-9). Cooper cites to *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, No. 92-C-2379, 1993 WL 387346 (N.D. Ill. Sept. 23, 1993), where the court excluded a proposed expert

economist who intended to testify about the plaintiff's average profit per customer.  *Id.* at *1-2. The proposed expert's calculation involved only subtracting the plaintiff's costs from its revenue, and then dividing by the total number of customers.  *Id.* at *2.  The court held that the proposed testimony was not scientific, technical, or specialized, nor was it helpful to the jury because it was a simple average.  *Id.* at *2.  Here, while Rosenberg does rely on simple mathematics in calculating Sterusky's lost earning capacity using the "total offset" method, the similarities end here.  Plainly, Rosenberg brings more to the table than calculating simple averages, such as his knowledge of the commonly used methods for calculating earning capacity and the relevant resources to consult when making those calculations.  His testimony could be helpful to the trier of fact in determining what Sterusky's lifetime earnings would have been. Accordingly, this argument is also rejected.

Finally, Cooper argues that Rosenberg's opinion is unfairly prejudicial and should be excluded under Fed. R. Evid. 403.  (Def.'s Mot. Exclude Rosenberg 8-9).  Cooper states, "Rosenberg will be called as an expert and will perceived as an expert by the jury.  There is a danger they will assign his opinions more weight than is proper."  (Def.'s Mot. Exclude Rosenberg 9).  This does not establish a basis for prejudice.

For the foregoing reasons, Cooper's Motion to Exclude Rosenberg is denied.

### 5.   *Cooper's Motion to Exclude Toby Terpstra (DN 51)*

Cooper moves for exclusion of Plaintiff's expert witness Toby Terpstra ("Terpstra") on the grounds that he is unqualified and that his opinions, as well as the visualizations he produced, are unreliable, prejudicial, and unhelpful to the jury.  (Def.'s Mot. Exclude Terpstra 1, 5, 8, 15, 16, DN 51).

### a.      Terpstra's Opinion

Terpstra works as a senior visual analyst at J.S. Held, LLC and testified that he was asked to "investigate the case and to create 3-D visualization materials." (Def.'s Mot. Exclude Terpstra Ex. 1, at 1-2, DN 51-1 [hereinafter Terpstra CV]; Terpstra Dep. 6:12-13, 9:17-10:19, 83:23-84:16, Aug. 28, 2023, DN 51-5).  Terpstra states that his area of expertise is "video analysis, photogrammetry, and 3-D site reconstructions." (Terpstra Dep. 6:17-23).  In the "overview" section of his report, Terpstra stated, "In reviewing the materials and performing the analysis, J.S. Held generated a three-dimensional model of the incident, including positions of vehicles and parties involved at various points in time.  The completed three-dimensional computer environment can be evaluated and reviewed from any angle and position." (Terpstra Report 2, DN 51-2).  Terpstra's visualizations depict a computer model of Cooper firing his weapon, draw a line showing the trajectory of the bullets, and show where bullets collided with the vehicle and Sterusky's body, and then show Sterusky's vehicle rolling backwards and colliding with another parked vehicle.  (*See, e.g.*, Terpstra Report 15; Def.'s Mot. Exclude Terpstra Ex. 4, DN 47-4).  Terpstra also created a version of these visualizations that omit the model of Cooper.  (*See* Def.'s Mot. Exclude Ex. 4).

In the "Summary of Conclusions" section of his report, Terpstra listed the following:

- Officer Slaubaugh walked approximately 180' from where he parked to where he was standing when Mr. Sterusky's vehicle collided with another parked vehicle.
- Mr. Sterusky's vehicle moved approximately 42 feet from where it was initially parked to where it came to rest after rolling backwards and colliding with another parked vehicle.
- Based on the synchronized video, Officer Slaubaugh arrived at the incident site and opened his door to exit the vehicle approximately 18 seconds after the last shot was fired by Officer Cooper.
- Officer Cooper was standing on the passenger side of his police vehicle when Officer Slaubaugh exited his vehicle.

21

- Based on the synchronized video, approximately 56 seconds elapsed between when the last shot was fired by Officer Cooper and when Mr. Sterusky's vehicle collided with another parked vehicle.
- Based on the synchronized video, Mr. Sterusky's vehicle had minimal if any backwards movement while shots were being fired.
- The 3D visualizations created to assist in understanding the sequence of events are based on video analysis, 3D modeling, 3D analysis, photogrammetry, physical evidence, and witness statements.  They are a fair and accurate representation of the scene, and evidence locations resulting from the shooting incident.

(Terpstra Report 15-16).  When asked whether he would call his visualizations animations or simulations, Terpstra answered that neither name was appropriate, and that "3-D visualization" or "computer visualization" is the appropriate term.  (Terpstra Dep. 69:1-5).

### b.      Terpstra's Qualifications

Cooper notes that Terpstra only has an associate's degree and that he lacks expertise in the areas of law enforcement, use of force, ballistics, and medicine.  (Def.'s Mot. Exclude Terpstra 5).  Terpstra stated in his deposition that he does not intend to offer opinions as to law enforcement practices or use of force and did not dispute that he was not an expert in the subjects of ballistics or medicine.  (Terpstra Dep. 9:17-10:19, 83:23-84:16).  Plaintiff further disclaims that Terpstra is attempting to offer any opinions on these subjects and emphasizes that Terpstra's opinion in this case is a visualization of the evidence as well as the opinions of the KSP investigation.  (Pl.'s Resp. Mot. Exclude Terpstra 5, DN 61).

With respect to Terpstra's visualizations, his CV shows that he has worked as a forensic animator since 2005 and has held his position as a Senior Visualization Analyst III since 2021.  (Terpstra CV 2).  He has served as an expert witness in civil and criminal actions for both plaintiffs and defendants and has had his visualizations used in prior court proceedings.  (Terpstra Dep. 86:5-88:6; *see* Terpstra CV 11).  Terpstra has authored peer-reviewed publications and taught numerous lectures and courses on photogrammetry and video analysis.

22

(*See* Terpstra CV 3-6).    Terpstra's ample experience and involvement in the field of photogrammetry, video analysis, and computer visualization "provide a foundation" for him to create visualizations of this sort.  *Smelser*, 105 F.3d at 303 (citation omitted).

### c.    Reliability

Cooper next argues that Terpstra's opinions are unreliable because "they contain numerous dissimilarities with the actual facts . . . and the computer simulations cannot themselves be cross-examined."  (Def.'s Mot. Exclude Terpstra 8).

Cooper maintains that there are vast discrepancies between Terpstra's visualizations and the actual confrontation between Sterusky and Cooper.  First, Cooper complains that Terpstra did not include any visualizations of the struggle between Sterusky and Cooper, Cooper's attempt to subdue Sterusky, or Sterusky's stabbing of Cooper.   (Def.'s Mot. Exclude Terpstra 9-10).  Terpstra explained that he was not asked to prepare any visualization for other portions of the encounter.  (Terpstra Dep. 17:6-9).  That Terpstra did not prepare a visualization of alleged events before and after the event he visualized does not render his opinion unreliable.  Cooper will have the opportunity to present evidence regarding other stages of the encounter between Sterusky and Cooper.

Cooper also characterizes Terpstra's visualizations as *ipse dixit*, arguing that his visualizations ignore several facts drawn from Cooper's deposition and the report of Cooper's expert Martin.  (*See* Def.'s Mot. Exclude Terpstra 10-13).  As explained below in the discussion of Cooper's Motion for Summary Judgment, what occurred in the seconds after Cooper's body camera fell from his chest is a hotly debated factual issue, so just because Terpstra has not adopted Cooper's version of the facts does not render his opinion unreliable.  For example, Cooper complains that Terpstra's visualization depicts Sterusky as being seated throughout the

shooting, but when asked, Terpstra explained that this detail was based on the KSP report. (Terpstra Dep. 31:18-32:1).  Cooper's criticisms of the evidence that Terpstra chose to rely on is better suited for exploration during cross-examination.

In addition, Cooper asserts that the visualization lasts three minutes, whereas the actual shooting lasted only a little over five seconds.  (Def.'s Mot. Exclude Terpstra 10).  The bottom left corner of the visualization displays "17 Shots Fired in ~5 seconds *Sequence Undetermined*" throughout the duration of the shooting.  (*See* Def.'s Mot. Exclude Terpstra Ex. 4).  The visualizations plainly do not represent that this shooting took place over the course of three minutes.

Finally, Cooper points out that Terpstra's visualizations do not depict that the windows on Sterusky's car were tinted.  (Def.'s Mot. Exclude Terpstra 13).  Terpstra does not purport to perfectly recreate the event, and this discrepancy can be explored on cross-examination.

Terpstra detailed the procedure used to create his visualizations based on all of this data and provided an appendix showing the numerous documents, photographs, videos, and reports he reviewed in creating these visualizations.  (Def.'s Mot. Exclude Terpstra Ex. 1, at 7-9).  Cooper's criticisms all go more to Terpstra's conclusions as opposed to his principles or methodologies, and therefore would be better addressed on cross-examination.  *See, e.g.*, *Raimey v. City of Niles*, 676 F. Supp. 3d 547, 561-62 (N.D. Ohio 2022), *aff'd*, 77 F.4th 441 (6th Cir. 2023) (finding reliable an expert in forensic animation, video analysis, and photogrammetry who created a forensic 3D animation of a police shooting where defendants argued that the conclusions in his report were "refuted in every way by the physical evidence . . . .").  Accordingly, this argument is not well-taken.

###### d.        Helpfulness and Prejudice

Cooper also briefly argues that Terpstra's visualizations are unhelpful to the jury and prejudicial.   (Def.'s Mot. Exclude Terpstra 15-17).   Cooper repeats his assertion that the visualizations are factually inaccurate, and he expresses concern that the jury may give them undue weight because they were generated by a computer.   (Def.'s Mot. Exclude Terpstra 15-17).   Cooper asks that, if the visualizations are not excluded on these grounds, that the Court provide a   limiting instruction to the jury.   (Def.'s Mot. Exclude Terpstra 17).   As explained above, Terpstra stated the basis for his conclusions and any disagreement with them does not present a ground for exclusions and can be explored on cross-examination.   The Court can see no basis for concluding that the mere fact that these visualizations were generated by a computer creates an undue risk of juror confusion or prejudice.

Accordingly, for the foregoing reasons, this motion is denied.

### B.        Defendants Motion for Summary Judgment (DN 48)

#### 1.        *Standard of Review*

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.   *See* Fed. R. Civ. P. 56(a).   The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 2.  *The Parties' Characterization of the Facts*

Due to the presence of body camera footage, the parties' characterization of the events that preceded the altercation between Sterusky and Cooper are largely undisputed. (Def.'s Mem. Supp. Mot. Summ. J. 1-9; Pl.'s Resp. Def.'s Mot. Summ. J. 8-10). Shortly after Cooper seized Sterusky by the arm, however, Cooper's body camera fell off, after which point only audio of the interaction was captured. (Cooper Video 09:27:56-09:28:04). The parties present incompatible theories as to what occurred after Cooper's bodycam was dislodged.

### a.  **Plaintiff's Theory**

In support of his theory, Plaintiff relies on circumstantial evidence, Tiderington's report, the KSP investigation report, and apparent contradictions in Cooper's recollection of the events. (*See* Pl.'s Resp. Mot. Summ. J. 10-24). Plaintiff asserts that Cooper was restraining Sterusky, with both men standing upright, before Sterusky broke free and ran into his car. (Pl.'s Resp. Mot. Summ. J. 34, DN 59). Cooper fell forward after losing hold of Sterusky and fell face first onto the ground, which disturbed his left breast pocket. (Pl.'s Resp. Mot. Summ. J. 34). Plaintiff

contends Sterusky "shifted the car into gear" and began to move.  (Pl.'s Resp. Mot. Summ. J. 34).  At this point, Cooper began firing into the car to prevent Sterusky from escaping, with the first shot occurring before the car door was completely closed.  (Pl.'s Resp. Mot. Summ. J. 34).  The car rolled backwards slowly as Cooper continued to fire, standing adjacent to the vehicle and not in its path of travel.  (Pl.'s Resp. Mot. Summ. J. 35).

### b.        Cooper's Theory

Cooper relies on circumstantial evidence, his deposition, Martin's Report, and the KSP Report in support of his theory.  (*See* Def.'s Mem. Supp. Mot. Summ. J. 9-15).  Cooper asserts that after his body camera was knocked off, he gained control of Sterusky and forced him to the ground by applying a "soft empty hand technique."  (Cooper Dep. 42:25-43:15).  Cooper maintained control of Sterusky, now seated on the ground, with his right hand while using his left hand to reach for his radio.  (Cooper Dep. 49:19-50:4).  Sterusky slapped Cooper's hands away, grabbed a steak knife from the driver's side door pocket, and aggressed towards Cooper with an "evil look in his eye."  (Cooper Dep. 43:9-44:2, 99:24-100:6).  Sterusky attempted to stab Cooper twice in the neck, but the blade landed on his chest instead.  (Cooper Dep. 52:15-22).  Cooper's Kevlar vest protected his body from Sterusky's attacks.  (Def.'s Mem. Supp. Mot. Summ. J. 10).  Sterusky continued to approach Cooper, who was still on the ground, with "that look" and Cooper began firing his pistol.  (Cooper Dep. 52:22-23).  Cooper fired seventeen shots.  (Vaughn Dep. 80:14-18, Feb. 13, 2023, DN 48-6).  During at least five of Cooper's shots, the car door was still open.  (Def.'s Mem. Supp. Mot. Summ. J. 13).  At some point while Cooper was firing his weapon, Sterusky got, or fell, into his car and the driver's door closed to some degree.  (Cooper Dep. 59:3-10, 106:21-107:6).  Cooper then radioed to police dispatch, stating that he had fired his weapon and reporting that "he pulled a knife out on me and

27

tried to stab me in my chest."  (EDP Dispatch Audio 0:01:05-08, DN 47-2).  Cooper ran for cover, and Sterusky's vehicle began slowly moving backwards.  (Cooper Dep. 61:25-62:3).

### 3.    *Analysis*

#### a.        **Fourth Amendment—Excessive Force**

Cooper asserts that he is entitled to qualified immunity because he used reasonable and necessary force and did not violate Sterusky's clearly established constitutional rights.  (Def.'s Mem. Supp. Mot. Summ. J. 20-21).

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known."  *Ward v. Borders*, No. 3:16-CV-393-RGJ-RSE, 2023 WL 5108598, at *6 (W.D. Ky. Aug. 9, 2023) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).  "It 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Qualified immunity shields federal and state official from liability unless a plaintiff shows both "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "A right is clearly established for purposes of overcoming the qualified immunity defense only when 'existing precedent [has] placed the statutory or constitutional question beyond debate . . . .'"  *Id.* (alteration in original) (quoting *al-Kidd*, 563 U.S. at 741).  "Thus, an official 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"  *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)).

"The 'salient question' in determining if a defendant is entitled to qualified immunity is whether she had 'fair warning' that her conduct was unconstitutional." *Id.* at 276 (quoting *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019)).

"The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity." *Ward*, 2023 WL 5108598, at *6 (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)).   A defendant must first argue facts that he or she acted within his or her discretionary authority. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire*, 205 F.3d at 311).  If a defendant succeeds, "the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Id.* (quoting *Gardenhire*, 205 F.3d at 311).  To do so, a plaintiff need not identify an earlier decision that is "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 741).  The Sixth Circuit has also recognized that a right may be clearly established even without existing precedent where a violation was "sufficiently 'obvious' under the general standards of constitutional care . . . ." *Hum. Rts. Def. Ctr. v. Winn*, 431 F. Supp. 3d 925, 934-35 (E.D. Mich. 2020) (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005)).

"Fourth Amendment excessive-force claims are analyzed under an objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene." *Tucker v. Ky. State Police Post #4*, No. 3:23-CV-P328-JHM, 2023 WL 6929815, at *3 (W.D. Ky. Oct. 19, 2023) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)).  "In deciding whether the force used was excessive, we

balance the government's interests in protecting others (including the police) and curbing crime against a suspect's right to not to be injured." *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093-94 (6th Cir. 2023) (citing *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022)). "Three factors are particularly relevant:  (1) 'the severity of the crime at issue,' (2) 'whether the suspect pose[d] an immediate threat to the safety of the officers or others,' and (3) 'whether he [wa]s actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (alterations in original) (quoting *Graham*, 490 U.S. at 396). These factors are non-exhaustive, and "the 'ultimate inquiry . . . must always be whether the totality of the circumstances justified the use of force.'" *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (quoting *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)).

"In excessive force cases, the threat factor is 'a minimum requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Id.* at 424 (quoting *Mullins*, 805 F.3d at 766). Accordingly, analysis is focused on this factor. In considering the parties' arguments, the Court is mindful that "in cases where the witness most likely to contradict the officer's testimony is dead, 'the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Adams v. Blount Cnty.*, 946 F.3d 940, 949 (6th Cir. 2020) (quoting *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010)).

The reasonableness of the use of deadly force is measured "based on an 'objective assessment of the danger a suspect poses at that moment.'" *Woodcock*, 679 F. App'x at 424 (quoting *Mullins*, 805 F.3d at 766). If a jury were to accept Cooper's testimony that he employed deadly force because Sterusky was aggressing towards him with a steak knife, his use

30

of force would have been reasonable and he would be entitled to qualified immunity under Sixth

Circuit precedent.  *See, e.g.*, *Hall v. Braun*, 546 F. Supp. 3d 553, 560-61 (W.D. Ky. 2021), *aff'd*

*sub nom. Kirilova v. Braun*, No. 21-5649, 2022 WL 247751 (6th Cir. Jan. 27, 2022) (finding

qualified immunity where the decedent had lunged at the officer with a metal skewer); *Reich v.*

*City of Elizabethtown*, 945 F.3d 968, 979, 982 (6th Cir. 2019) (finding qualified immunity where

officers shot a knife-wielding individual who "took a step" toward the officers while raising the

knife in his right hand).  The factual record here, however, is not so straightforward.

     First, Cooper's ostensibly contradictory testimony could lead a reasonable juror to have

doubts as to his credibility.  For example, in his initial interview with KSP, Cooper explained

what happened in the seconds preceding the shooting:

> I still have this hand on him, and he finally just says fuck it, and he, uh, smacks
> his hand on the, on the, on the door itself, on the driver's door, smacks his hand
> on the driver's door, and like there's a bunch of pens and pencils or whatever that
> were in there, and they were like, like they all kind of like spread apart, and he
> grabbed one singular item or whatever, whatever it was.  I, I couldn't tell at the
> time, but I knew like when he pulled it out, and he pulled it out ****, and he
> swung it at me, and it was like sh, it was sharp, and it looked, it looked sharp and
> long.  That's all, that's all I knew it was, and so, uh, he took it, and he, uh, came,
> came, he swung at me, and I kind of tried to evade it, and as he's coming back, I
> felt like something hit my chest, and so as he, when he came back, when he came
> back with it, I'm trying to evade again, and he comes back again and tries to hit
> me again, and I, I could feel the wind and, and everything from it.  I tried to e
> [sic], uh, get back off of him, and as I'm going back, I'm drawing my weapon, but
> before I can, uh, before—yeah, I'm drawing my weapon, and I come back, and I
> hit—uh, my, my left leg slides underneath me, so it, it was kind of like really slick
> out there that day, and like I guess it was after like the tornadoes and stuff like
> that, uh, like it, it, it just slipped ****, so I kinda fall to the ground, boom.  Uh, I
> get back up, and I turn.  I can't remember if he was in the car or if he was outside
> the car.  I can't, I can't remember.  I do remember that, uh, I did fire, uh, rounds at
> hi[m], at him and the vehicle, and, uh, as, uh, he was trying to back up in, back
> up, uh, I'm sorry, he was backing the vehicle.

(Pl.'s Resp. Mot. Summ. J. Ex. 7, at 229, DN 59-7).  By contrast, in his most recent deposition,

Cooper testified,

> He grabs a knife and he stabs me in my chest twice.  I'm trying to back up.  I'm trying to back away from him, but he's continuously aggressing with the knife.  I finally get—I fall back, I slam my head on the ground, and as I'm getting back up, he's getting up off of—from the—I guess he has his arm on the seat of the vehicle itself and he has that intent, that evil look in his eye.  I don't know how else to describe it.  There's just this evil—evil, that's the only way I can describe how it looked, this evil gaze in his eye.  And he was coming for me.  So I deployed my firearm at him multiple times in a short amount of time.

(Cooper Dep. 43:17-44:4).  While Cooper's description has remained consistent that Sterusky attempted to stab him, his description of Sterusky's behavior immediately preceding his decision to shoot has arguably changed.  Further, he initially expressed uncertainty about what Sterusky held, while later stating with certainty that it was the steak knife discovered in Sterusky's vehicle.  (Pl.'s Resp. Mot. Summ. J. Ex. 7, at 230; Cooper Dep. 51:13-22).  Cooper's inconsistent descriptions "require[] a determination of [his] credibility.  The credibility of witnesses is peculiarly within the province of the jury, and a trial court should never substitute its opinion of the credibility of witnesses for that of the jury." *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, No. 317CV00419GNSCHL, 2024 WL 56938 (W.D. Ky. Jan. 4, 2024) (quoting *Jordan v. Blount Cnty.*, 458 F. Supp. 3d 870, 881 (E.D. Tenn. 2020)); *see also Kabba v. Williams*, No. 3:16-2718, 2017 WL 5478394, at *2 (E.D. Tenn. Nov. 15, 2017) ("[D]oubt as the credibility of material witnesses will create a genuine issue of material fact sufficient to render granting summary judgment improper." (citing *Transway Fin. Co., v. Gershon*, 92 F.R.D. 777, 778-79 (E.D.N.Y. 1982))).

Next, Cooper argues that the knife cannot be seen in the passenger's seat of Sterusky's vehicle before the shooting but was found there afterwards, evidencing that Sterusky used the knife during the attack.  (Def.'s Reply Mot. Summ. J. 1-2, DN 64).  In his report, Martin provided the frames from Cooper's body camera video before the shooting showing the passenger's seat, and the knife does not appear to be there.  (Martin Report 50-56).  Plaintiff's

expert, Thomas Tiderington ("Tiderington"), reviewed the same footage and concluded that the knife was in the passenger's seat. (Tiderington Report 21, DN 59-24). Reviewing the frames Martin provided, none appear to provide a clear view into the passenger's seat, either due to blurriness or unfavorable angles. (*See* Martin Report 50-56).

Cooper also points to defects on his uniform as evidence that corroborates his account that Sterusky stabbed him with the knife. (Def.'s Mem. Supp. Mot. Summ. J. 17-18). The front left pocket of Cooper's uniform has a marking that a KSP forensic laboratory examination determined is consistent with being cut. (Def.'s Mot. Summ. J. Ex. 38, at 1). Vaughn testified, however, that the marks on Cooper's uniform were not traced to any particular instrument. (Vaugh Dep. 19:5-15). Looking at the defects on Cooper's uniform in the light most favorable to Plaintiff, a reasonable juror could find that they appear minor, and inconsistent with the assertion that Sterusky attempted to kill Cooper with a steak knife. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 28, at 3-4, DN 59-28). Accordingly, there is a genuine issue of material fact as to whether Sterusky attempted to stab Cooper with a knife.

Further, there is ample evidence from which a reasonable juror could conclude that Sterusky was attempting to flee from Cooper when Cooper began firing on him. Vaugh testified in his deposition that based on the evidence, it appears that Sterusky was seated inside his vehicle when the shots were fired. (Vaughn Dep. 23:22-24:3). Vaughn also noted that there was no blood on the gear shift, indicating that Sterusky shifted the vehicle out of park before he was shot. (Vaughn Dep. 21:16-22:14). Tiderington also opined that Sterusky was seated in the vehicle with the door closed when Cooper began firing. (Tiderington Report 33). Viewed in the light most favorable to Plaintiff, this evidence could discredit Cooper's testimony that Sterusky was aggressing towards him when he began shooting.

There is evidence in the record from which a reasonable juror could conclude that Sterusky was attempting to flee after resisting Cooper's attempts to seize him, and that in the brief time between Sterusky's decision to flee and Cooper's commencement of gun fire, Sterusky never used a knife or presented an objective threat of death or serious bodily harm to Cooper. Accordingly, there is a genuine issue of material fact as to whether the "minimum requirement" for deadly force was met. *Woodcock*, 679 F. App'x at 424 (quoting *Mullins*, 805 F.3d at 765). If the jury believed that Cooper fired on Sterusky in such a circumstance, Sixth Circuit precedent would not support qualified immunity. *See, e.g.*, *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007) (denying qualified immunity to an officer who shot a fleeing suspect who wrestled away from the officer).

Accordingly, Cooper's motion for summary judgment is denied

### b. State Law Claims

Cooper argues that Plaintiff's state law negligence claim must be dismissed because it is incompatible with his Section 1983 claim for excessive force. (Def.'s Mem. Supp. Mot. Summ. J. 40-41). Cooper also states that he is entitled to summary judgment on Plaintiff's state law assault and battery claim arguing: (1) there was no constitutional violation; (2) Cooper is protected by qualified official immunity; and (3) Cooper is protected by law enforcement privilege created by KRS 503.090. (Def.'s Mem. Supp. Mot. Summ. J. 41-43). Plaintiff does not respond to any of these arguments and is therefore deemed to have conceded them. *See Barnes v. Lantech.com, LLC*, No. 3:18-CV-00507-BJB, 2021 WL 260666 (W.D. Ky. Jan. 26, 2021) (citing *AK v. Behav. Health Sys.*, 382 F. Supp. 3d 772, 774-75 (M.D. Tenn. 2019).

Accordingly, Defendant's motion is granted as to Plaintiff's state law negligence and assault and battery claims.

4.   *Conclusion*

Accordingly, Cooper's motion for summary judgment is denied as to Plaintiff's Section

1983 claim and granted as to Plaintiff's state law claims and claim for punitive damages.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Plaintiff's Motion to Exclude Tom Martin (DN 45) is **DENIED**.

2.      Plaintiff's Motion to Exclude John Ryan (DN 46) is **GRANTED IN PART**.

3.      Defendant's Motion for Summary Judgment (DN 48) is **GRANTED IN PART**.

4.      Defendant's Motion to Exclude Joseph Rosenberg (DN 50) is **DENIED**.

5.      Defendant's Motion to Exclude Toby Terpstra (DN 51) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

August 29, 2024

cc:     counsel of record